# IN THE SUPREME COURT OF CALIFORNIA

ROBERT ZOLLY et al.,
Plaintiffs and Appellants,

v.

CITY OF OAKLAND
Defendant and Respondent.

S262634

First Appellate District, Division One
A154986

Alameda County Superior Court
RG16821376

August 11, 2022

Justice Liu authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Kruger, Groban, and Guerrero concurred.

Justice Jenkins filed a concurring opinion, in which Justice Corrigan concurred.

ZOLLY v. CITY OF OAKLAND

S262634


Opinion of the Court by Liu, J.


Through a series of ballot initiatives, California voters have imposed several constitutional limitations on the ability of local governments to tax. Because these limitations may apply to charges that a local government does not formally designate as taxes, whether particular charges fall within the scope of the Constitution's taxation limitations is a recurring issue that both voters and the courts have addressed.

In 2012, the City of Oakland approved two contracts granting private waste haulers the right to "transact business, provide services, use the public street and/or other public places, and to operate a public utility" for waste collection services. As "consideration for the special franchise right," the waste haulers agreed to pay certain fees to Oakland. We granted review to decide how such fees should be treated under article XIII C of the California Constitution, which sets forth voter approval requirements that apply to taxes imposed by local government. (All references to articles are to the California Constitution.) Oakland claims that article XIII C, as amended in 2010 by Proposition 26, categorically exempts its challenged fees from such voter approval requirements, while plaintiffs Robert Zolly, Ray McFadden, and Stephen Clayton argue that the fees are exempt only if the amount of the fee bears a reasonable relationship to the value of the franchise.

We hold that Oakland has not shown on demurrer that its challenged fees are exempt from article XIII C's voter approval

requirements. Accordingly, we affirm the Court of Appeal's judgment.

## I.

Proposition 26 provides the general definition of a "tax" and a list of enumerated exemptions that are at the center of this dispute. To understand this measure, it is helpful to place it in the context of other voter initiatives that have limited the ability of local governments to tax, beginning in 1978 with the passage of Proposition 13.

Proposition 13 required the imposition of any "special taxes" to be approved by two-thirds of the qualified electors of the city, council, or special district. (Art. XIII A, § 4.) Proposition 13 did not define "special taxes." In *City and County of San Francisco v. Farrell* (1982) 32 Cal.3d 47, "we construe[d] the term 'special taxes' . . . to mean taxes which are levied for a specific purpose . . . ." (*Id.* at p. 57.)

In 1996, California voters passed Proposition 218, which amended the Constitution's voter approval requirements for local revenue-raising measures by adding articles XIII C and XIII D. (*Citizens for Fair REU Rates v. City of Redding* (2018) 6 Cal.5th 1, 10.) Article XIII D, which is not relevant here, "limits the authority of local governments to assess taxes and other charges on real property." (*Citizens for Fair REU Rates*, at p. 11.) Article XIII C "buttresses article XIII D by limiting the other methods by which local governments can exact revenue using fees and taxes not based on real property value or ownership." (*Citizens for Fair REU Rates*, at p. 10.) Specifically, article XIII C provides that "[a]ll taxes imposed by any local government shall be deemed to be either general taxes or special taxes." (Art. XIII C, § 2, subd. (a).) General taxes

must be approved by a majority vote at a general election, while special taxes must be approved by a two-thirds vote. (Art. XIII C, § 2, subds. (b), (d).)

Proposition 218 did not define what constitutes a "tax." The electorate addressed that issue in 2010 with the enactment of Proposition 26. (*Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 260 (*Jacks*).) This measure amended article XIII C to provide that a " 'tax' means any levy, charge, or exaction of any kind imposed by a local government." (Art. XIII C, § 1, subd. (e).) This general definition is qualified by seven exemptions:

"(1) A charge imposed for a specific benefit conferred or privilege granted directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of conferring the benefit or granting the privilege.

"(2) A charge imposed for a specific government service or product provided directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of providing the service or product.

"(3) A charge imposed for the reasonable regulatory costs to a local government for issuing licenses and permits, performing investigations, inspections, and audits, enforcing agricultural marketing orders, and the administrative enforcement and adjudication thereof.

"(4) A charge imposed for entrance to or use of local government property, or the purchase, rental, or lease of local government property.

"(5) A fine, penalty, or other monetary charge imposed by the judicial branch of government or a local government, as a result of a violation of law.

"(6) A charge imposed as a condition of property development.

"(7) Assessments and property-related fees imposed in accordance with the provisions of Article XIII D." (Art. XIII C, § 1, subd (e)(1)–(7).) Here the parties dispute the scope of the fourth exemption.

Following this list of exemptions, Proposition 26 provides that "[t]he local government bears the burden of proving by a preponderance of the evidence that a levy, charge, or other exaction is not a tax, that the amount is no more than necessary to cover the reasonable costs of the governmental activity, and that the manner in which those costs are allocated to a payor bear a fair or reasonable relationship to the payor's burdens on, or benefits received from, the governmental activity." (Art. XIII C, § 1, subd. (e).)

Proposition 26 also amended article XIII A to include a similar, though not identical, definition and list of exemptions regarding what constitutes a tax imposed by the state government. (Art. XIII A, § 3.)

## II.

In this case, the trial court sustained Oakland's demurrer to plaintiffs' second amended complaint alleging that certain franchise fees were imposed in violation of article XIII C. In considering whether a demurrer should have been sustained, "we accept as true the well-pleaded facts in the operative

complaint . . . ." (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1189, fn. 1.)

Plaintiffs allege that in 2012, Oakland initiated a procurement process for franchise contracts regarding garbage, mixed materials and organics, and residential recycling services. Following a settlement between the two firms that submitted proposals, Oakland awarded the garbage and mixed materials contracts to one firm and the residential recycling contract to the other firm.

Oakland's ordinance approving the mixed materials and organics contract provided for an initial annual franchise fee of $25,034,000, with subsequent franchise fees " ' "adjusted annually by the percentage change in the annual average of the Franchise Fee cost indicator." ' " (*Zolly v. City of Oakland* (2020) 47 Cal.App.5th 73, 79 (*Zolly*).) Thereafter, Oakland passed an ordinance reducing this franchise fee by $3.24 million. The ordinance approving the residential recycling contract provided for an initial annual franchise fee of $3,000,000, with a similar mechanism for annual adjustments.

Based on " 'citizen complaints,' " an Alameda County grand jury " 'undertook a comprehensive investigation related to the solicitation and award' " of these contracts. (*Zolly, supra,* 47 Cal.App.5th at p. 79.) The grand jury found that Oakland's fees were disproportionately higher than franchise fees paid to other Bay Area municipalities and special districts. It also found Oakland's procurement process was mishandled and subject to political considerations.

Plaintiffs are owners of multifamily properties who pay their tenants' waste collection bills. Their second amended complaint alleges that Oakland's fees violated article XIII C

because " '[n]either of the franchise fees bears a reasonable relationship to the value received from the government and they are not based on the value of the franchises conveyed.' " (*Zolly*, *supra*, 47 Cal.App.5th at p. 81.) The trial court sustained Oakland's demurrer to the second amended complaint, finding that plaintiffs' allegations that the challenged fees were passed along indirectly to ratepayers were insufficient to establish that they were taxes imposed on consumers. The Court of Appeal affirmed in part and reversed in part. As relevant here, it held that plaintiffs adequately stated a cause of action under article XIII C by alleging that Oakland's challenged fees did not bear a reasonable relationship to the franchises' values, as required by section 1, subdivision (e) of that article.

The Court of Appeal relied on our opinion in *Jacks*, *supra*, 3 Cal.5th 248. There, we addressed the circumstances in which franchise fees constitute "taxes" subject to the Constitution's voter approval requirements. Because the franchise fee there had been imposed prior to 2010, we limited our discussion to the interpretation of Proposition 218. (*Jacks*, *supra*, 3 Cal.5th at p. 263, fn. 6.) First, we acknowledged that "franchise fees" have "[h]istorically . . . not been considered taxes." (*Id.* at p. 267.) Next, we observed that the common denominator among the "categories of valid fees" we had previously recognized as falling outside the Constitution's taxation limitations was that the charge or fee "was restricted to an amount that had a reasonable relationship to the benefit or cost on which it was based." (*Id.* at pp. 267–268.) This "broader focus on the relationship between a charge and the rationale underlying the charge provides guidance in evaluating whether the [franchise fee in question was] a tax." (*Id.* at p. 269.) We held that although a franchise fee is not per se a tax, "[t]o the extent a franchise fee

6

exceeds any reasonable value of the franchise, . . . the excessive portion is a tax." (*Ibid.*)

The Court of Appeal first rejected Oakland's argument that *Jacks*'s holding should be limited to the narrow context where a surcharge is placed directly on customers' bills, instead reasoning that "*Jacks* instructs us to look beyond any label and determine whether such a fee 'reflect[s] a reasonable estimate of the value of the franchise.' " (*Zolly, supra,* 47 Cal.App.5th at p. 85.)

The Court of Appeal then considered whether the adoption of Proposition 26 altered the analysis. The court assumed the applicability of article XIII C, section 1, subdivision (e)(4), which refers to charges "imposed for entrance to or use of local government property, or the purchase, rental, or lease of local government property," and then focused its analysis on whether that exemption contained a reasonableness requirement. (*Zolly, supra,* 47 Cal.App.5th at p. 86.) The Court of Appeal observed that although the text of the specific exemption lacked an express reasonableness requirement, article XIII C, section 1, subdivision (e) contained a "broad statement regarding the government's burden of proof," including a requirement that the local government bear the burden of proving that a charge is " 'no more than necessary to cover the reasonable costs of the governmental activity.' " (*Zolly,* at p. 86.)

Turning to the ballot materials, the Court of Appeal found that they "uniformly indicate a desire to expand the definition of what constituted a 'tax' for purposes of article XIII C." (*Zolly, supra,* 47 Cal.App.5th at p. 87.) This included the specific intent to prevent local governments from disguising taxes as "fees" in order to generate revenue without adhering to existing voter

approval requirements. (*Ibid.*) In light of this "clear" intent to close loopholes and expand the definition of a tax, the Court of Appeal concluded that franchise fees "must still be reasonably related to the value of the franchise" to be exempt under article XIII C, section 1, subdivision (e). (*Zolly*, at p. 88.)

In addition, the Court of Appeal rejected Oakland's argument that the challenged fees were not taxes " ' "imposed by local government" ' " because they were merely "consideration" for a contract negotiated between Oakland and the utilities. (*Zolly*, *supra*, 47 Cal.App.5th at p. 88.) The Court of Appeal reasoned that allowing charges to escape the bounds of article XIII C on that theory would enable local governments to contract with third parties to impose a desired tax on residents, thereby undermining the purposes of Propositions 218 and 26. (*Zolly*, at p. 88.) The Court of Appeal also reasoned that our opinion in *Jacks* "implicitly rejected this argument." (*Zolly*, at p. 88.) In particular, the Court of Appeal observed that although the charge at issue in *Jacks* was similarly established " '[p]ursuant to an agreement between [the utility provider] and defendant City of Santa Barbara,' " this fact did not automatically exempt the charge from being treated as a tax. (*Zolly*, at pp. 88–89, quoting *Jacks*, *supra*, 3 Cal.5th at p. 254.) Instead, the court held, the crux of the analysis remained whether the fees imposed bear a reasonable relationship to the value received from the government.

## III.

As an initial matter, Oakland argues that plaintiffs lack standing because they are not "directly obligated" to pay for the franchise fees; instead, any economic injury they suffer is only indirectly passed on to them in the form of waste management

8

fees charged by the waste haulers. Although Oakland did not raise this issue below, " '[c]ontentions based on a lack of standing involve jurisdictional challenges and may be raised at any time in the proceeding.' " (*Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 233, quoting *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 438.)

Absent specific requirements for a statutory cause of action, standing in civil cases is governed by the "general standing requirements under [Code of Civil Procedure] section 367." (*Weatherford v. City of San Rafael* (2017) 2 Cal.5th 1241, 1249.) Code of Civil Procedure section 367 requires that an action "be prosecuted in the name of the real party in interest," and we have defined a " 'real party in interest' " as " 'any person or entity whose interest will be directly affected by the proceeding,' " including anyone with " 'a direct interest in the result.' " (*Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1178, quoting *Sonoma County Nuclear Free Zone '86 v. Superior Court* (1987) 189 Cal.App.3d 167, 173.) In their operative complaint, plaintiffs allege that Oakland's fees have caused their waste collection rates to increase every month. Such "lost money or property . . . is itself a classic form of injury in fact." (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 323.) Accordingly, plaintiffs' allegations of economic injury caused by the challenged fees are sufficient to confer standing.

Oakland relies on *Chiatello v. City and County of San Francisco* (2010) 189 Cal.App.4th 472 (*Chiatello*) and *County Inmate Telephone Service Cases* (2020) 48 Cal.App.5th 354 (*County Inmate*) for the proposition that plaintiffs must be directly obligated to pay the fees in order to challenge them under Proposition 26. But those cases are distinguishable.

Although Oakland reads *Chiatello* to establish a general limitation on standing in tax challenges, *Chiatello* involved a specific statutory cause of action under Code of Civil Procedure section 526a. (*Chiatello, supra,* 189 Cal.App.4th at pp. 480–481.) For that specific cause of action, the relevant statutory provisions limited standing to an individual " 'who is assessed for and is liable to pay . . . a tax' " in a given " 'county, town, city, or city and county of the state . . . .' " (*Id.* at p. 481, citing Code Civ. Proc., § 526a.) No similar requirement is present in article XIII C.

In *County Inmate*, inmates in nine counties challenged the allegedly inflated commissions paid by telecommunications companies to the counties under contracts giving them the exclusive right to provide telephone services. The inmates alleged that the companies passed on the cost of the commissions to the inmates and their families. But the Court of Appeal held that because the inmates had "no legal responsibility to pay anything to the counties," they lacked standing to "contend the commissions are an unconstitutional tax" under Proposition 26 and to seek a refund of those taxes. (*County Inmate, supra,* 48 Cal.App.5th at pp. 361, 360.) As support for a "general rule . . . that a person may not sue to recover excess taxes paid by someone else," the court cited *Grotenhuis v. County of Santa Barbara* (2010) 182 Cal.App.4th 1158. (*County Inmate,* at p. 360.) But that decision does not claim to pronounce any general limitation on standing. Instead, *Grotenhuis* involved the statutory requirements for a "tax refund action" under Revenue and Taxation Code section 5140, which expressly limits such an action to a " 'person who paid the tax.' " (*Grotenhuis,* at p. 1164.) That provision governs refund actions involving property taxes; different provisions apply to

refunds involving other forms of taxes. (See Rev. & Tax. Code, § 19382 [franchise and income taxes]; *id.*, § 6932 [sales and use taxes].) Accordingly, *County Inmate*'s reliance on Revenue and Taxation Code section 5140 as support for a general limitation on standing in all cases where plaintiffs seek a tax refund, without regard to the specific form of tax at issue, is misplaced.

In light of plaintiffs' allegations of an economic injury caused by the challenged fees, we hold that plaintiffs have standing to file this suit.

## IV.

In arguing that its challenged fees are not subject to the Constitution's voter approval requirements, Oakland first contends that the fees in question do not fall within Proposition 26's general definition of a "tax" due to the manner in which they were negotiated and agreed upon. Second, Oakland argues that even if the fees fall within the definition of a "tax," Proposition 26 categorically exempts all franchise fees from the Constitution's voter approval requirements. We address each argument in turn.

## A.

Turning to the general definition of a "tax" under Proposition 26, Oakland does not dispute its fees are a "levy, charge, or exaction of any kind." (Art. XIII C, § 1, subd. (e).) Instead, Oakland argues that these fees are not "imposed by a local government" because they were a product of voluntary contractual negotiations and are thus "consideration paid in exchange for those valuable franchise rights, including the right to do business with the municipality." Plaintiffs argue that Oakland's view would improperly add a "coercion requirement" to the term "imposed." According to plaintiffs, it is sufficient

that Oakland "established" the fees by exercising its legal authority to execute the two franchise agreements and then enacted those charges into law by ordinance. We agree with plaintiffs.

The text of article XIII C dispels the notion that a local government can only "impose[]" a tax by means of coercion. We have held, in the context of the Constitution's taxation provisions, that the "ordinary meaning" of " 'impose' " is merely to " 'establish.' " (*California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 944.) Additionally, the term "imposed" is used multiple times throughout article XIII C, including in the first and second exemptions. (Art. XIII C, § 1, subd. (e)(1), (2).) Because those exemptions apply to situations where a private party is paying a charge in exchange for a government benefit, service, or product, they plainly cover transactions resulting from contractual and voluntary negotiations between a private party and local government entity.

Proposition 26's use of the same term when referring to development charges, another form of voluntary charges, also indicates that the word "imposed" was not intended to limit article XIII C's application to situations involving compulsory charges. Prior to Proposition 26, courts had recognized that a general distinction between taxes and other charges was that "[m]ost taxes are compulsory rather than imposed in response to a voluntary decision to develop or to seek other government benefits or privileges." (*Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 874.) Case law typically justified excluding property development charges from the category of special taxes on that basis. (See, e.g., *Shapell Industries, Inc. v. Governing Board* (1991) 1 Cal.App.4th 218,

240 ["Under one line of reasoning, development fees are not taxes at all since . . . they are not compulsory but rather apply only to those who voluntarily choose to develop"]; *Terminal Plaza Corp. v. City and County of San Francisco* (1986) 177 Cal.App.3d 892, 907 [reasoning that development fee was not a special tax where it "is not compulsory in nature"].)  Against this backdrop, Proposition 26's use of the term "imposed" in connection with these voluntary development fees confirms that the voters did not intend to limit the term to situations where a charge is imposed through coercion.  (See Art. XIII C, § 1, subd. (e)(6) ["[a] charge imposed as a condition of property development"].)

Relatedly, Oakland argues that its fees were not "imposed" on customers because customers "may" only feel the indirect impact of those charges if the service provider uses it as "one cost factor among many in setting rates to customers."  But as explained above, whether customers were directly obligated to pay the charge to Oakland is immaterial.  It is sufficient that Oakland, pursuant to its legal authority, enacted these franchise fee agreements into law, thereby imposing these fees on the waste haulers that are indisputably obligated to pay them.  If Oakland is suggesting there is uncertainty as to whether any portion of customers' bills is actually attributable to the fees, that is a factual issue bearing on plaintiffs' allegations of financial injury that cannot be resolved on demurrer.

## B.

Having determined that the challenged fees fall within Proposition 26's general definition of a tax, we now consider whether Oakland has demonstrated on demurrer that these fees

are exempt from the Constitution's voter approval requirements by virtue of Proposition 26's express exemptions.

While the parties' briefing initially focused on whether article XIII C, section 1, subdivision (e)(4) (Exemption 4) includes a reasonableness requirement, we ordered supplemental briefing on the antecedent question of whether Oakland's fees fall within the scope of that exemption. In response, Oakland makes two arguments based on Exemption 4's two clauses. First, it contends that because the franchise at issue includes both the right to use government property and the right to take profit from that use, it is itself a form of "local government property." Accordingly, any fee paid for the franchise constitutes a "charge imposed for . . . the purchase . . . of local government property" under the second clause of Exemption 4. Second, Oakland argues that its fees also qualify as charges "imposed for . . . use of local government property" under the first clause of Exemption 4 because "the right to 'use the public street and/or other public places' was expressly identified as one part of the franchise property interests conveyed by Oakland to the private waste-haulers."

Beginning with the second clause of Exemption 4, we reject Oakland's argument that a franchise is "local government property" within the meaning of article XIII C. It is true that we stated in *Jacks* and other cases that "[a] franchise to use public streets or rights-of-way is a form of property . . . ." (*Jacks*, *supra*, 3 Cal.5th at p. 262; see *City & Co. of S.F. v. Market St. Ry. Co.* (1937) 9 Cal.2d 743, 747 ["A franchise is property."].) But none of those general statements were made in relation to the term "local government property" as used in article XIII C.

The word "property" is commonly used in two different senses. First, " 'property' is used simply to refer to the physical object in question — that is the thing itself." (*Pacific Gas & Electric Co. v. Hart High-Voltage Apparatus Repair & Testing Co., Inc.* (2017) 18 Cal.App.5th 415, 426.) Second, the word may " ' "denote the legal interest (or aggregate of legal relations) appertaining to such physical object." ' [Citation.] When used in the latter sense, 'property' is composed of a ' "complex aggregate of rights (or claims), privileges, powers, and immunities." ' " (*Ibid.*; see also *In re L.T.* (2002) 103 Cal.App.4th 262, 263; 51 Cal.Jur.3d (2022) Property, § 1.) Oakland, invoking this latter sense of the word, argues that a franchise is "local government property" because it is a "bundle of property interests." Similarly, our previous statements equating franchises to "property" were premised on this broader understanding. (See *Jacks, supra*, 3 Cal.5th at p. 254 ["the right to use public streets or rights-of-way is a property *interest*"], italics added.)

However, the term "local government property" in article XIII C seems to refer to physical objects under the control of a local government, such as its streets and rights-of-way. The first clause of Exemption 4 refers to charges imposed for "the entrance to or use of local government property," suggesting that "local government property" means physical land, objects, or equipment that those who pay the charge can either enter or use. The second clause of Exemption 4 refers to "the purchase, rental, or lease of local government property"; there, too, the phrase seems readily understood to mean tangible property such as land or buildings. Similarly, article XIII C, section 1, subdivision (e)(6) and (7) refers to a "charge imposed as a condition of property development" and to "[a]ssessments and

15

property-related fees imposed in accordance with the provisions of Article XIII D." In both contexts, the term "property" refers to actual physical objects or land, not property interests in such objects. (See art. XIII D, § 2, subd. (g) [defining "property ownership" as including "tenancies of real property"].)

But even if the term "property" in article XIII C includes property interests such as franchises, we conclude that a franchise cannot be local government property within the meaning of article XIII C for a separate reason. Although a franchise becomes a property interest that vests in the holder once granted, it does not exist as the local government's property prior to that vesting. Even when we have referred to franchise rights as "property," we have never held that such rights are property of the government awarding the franchise. Instead, we have characterized a franchise as "property rights created by the original grant" (*O'Sullivan v. Griffith* (1908) 153 Cal. 502, 505), which are then " 'vested in [the] individuals' " who own the franchise (*Spring Valley W. W. v. Schottler* (1882) 62 Cal. 69, 106). Because a franchise "becomes property in the legal sense of the word" only "[w]hen granted" to a franchise-holder (12 McQuillin, The Law of Municipal Corporations (3d ed. 2006) § 34.2), it cannot be said to be property belonging to the local government before the grant occurs. It is not "local government property" under article XIII C.

At oral argument, counsel suggested that Oakland, even though it does not have a property interest in the franchise itself, nonetheless has a property interest in its antecedent right to grant a franchise. But even if so, the challenged fees here were paid for the franchise that vested in the payors, not for the right to grant that franchise to another party. Accordingly, the

fees were not for the "purchase of" the "local government property" that Oakland posits.

We turn next to Oakland's argument regarding the first clause of Exemption 4 — namely, that the fees are charges "imposed for . . . use of local government property." Here, Oakland relies on our general statement in *Jacks* describing a franchise as encompassing "the right to use public streets or rights-of-way" (*Jacks*, *supra*, 3 Cal.5th at p. 254) and the terms of the specific ordinances enacting its challenged fees. The ordinances describe the franchises as including the rights to "transact business, provide services, use the public street and/or other public places, and to operate a public utility for Mixed Materials and Organics [or Residential and Commercial Recycling] collection services." We conclude that Oakland has not proven, on demurrer, that its challenged fees fall within the first clause of Exemption 4.

Oakland has not demonstrated as a matter of law that the payors paid the challenged fees in exchange for a specific use of government property that they would not have enjoyed had they not paid the fee. The text of Exemption 4 supports such a fact-specific requirement by focusing on the actual benefit exchanged between the payor and local government. Exemption 4 does not use the term "franchise fees"; instead, it exempts "[a] charge imposed for entrance to or use of local government property." By describing the qualitative rationale for the charge instead of using any formal labels, this language indicates that the voters intended to exempt only those fees that adhered to the rationale underlying that exemption — i.e., fees paid as consideration for a specific use of government property.

Comparing this language to article XIII C's other enumerated exemptions reinforces this conclusion. Like Exemption 4, the first two exemptions use the same "imposed for" language when referring to a charge paid in exchange for an exclusive benefit — "a specific benefit conferred or privilege granted" (art. XIII C, § 1, subd. (e)(1)) or "a specific government service or product" (*id.*, subd. (e)(2)). Article XIII C, section 1, subdivision (e)(3) also uses this "imposed for" language when referring to situations where a payor pays a fee in exchange for the provision of government services that allow it to operate in a regulated sphere. (See Voter Information Guide, Gen. Elec. (Nov. 2, 2020), analysis of Prop. 26 by Legis. Analyst, p. 58 [distinguishing between "regulatory fees" that "benefit the public broadly, rather than providing services directly to the fee payer"].) Accordingly, when Exemption 4 refers to a charge "imposed for . . . use of local government property," that latter term is most sensibly read to refer to the specific benefit that is being exchanged. By contrast, article XIII C, section 1, subdivision (e)(5) employs different language — "imposed *by* [a government entity] as a result of a violation of law" — when describing fines or penalties. (Italics added.) Such a distinction makes sense because fines and penalties are not paid in exchange for a specific benefit.

So understood, Exemption 4's "imposed for" language applies naturally to traditional types of entrance and user fees for local government property. For fees such as a park entrance fee, there is little question that payment is a necessary condition for "entrance to or use of" the property. (Art. XIII C, C, § 1, subd. (e)(4).) In other words, entrance to or use of a public park, bridge, or other government property is limited unless the entrance or user fee is paid. Specific kinds of franchise fees may

also meet this requirement. In *Jacks*, for example, the utility had obtained a right to "construct and use equipment along, over, and under" public roadways to facilitate the distribution of electricity. (*Jacks, supra*, 3 Cal.5th at p. 254.) By paying the franchise fee, the utility there had gained a specific "use of local government property" beyond what was otherwise available to the public (i.e., an easement to install equipment). (Art. XIII C, § 1, subd. (e)(4), see also *Mahon v. City of San Diego* (2020) 57 Cal.App.5th 681, 683–684 [describing a "franchise fee" paid by a private electric utility to a city as compensation for the "undergrounding" of electrical equipment].)

Here, Oakland has yet to demonstrate that the waste management providers gained any "use of local government property" in exchange for their payment of the challenged fees. (Art. XIII C, § 1, subd. (e)(4).) Although the ordinances refer to the service providers' ability to "use the public street and/or other public places," Oakland has not established that this "use" means anything more than the generally available prerogative to drive on public roads and rights-of-way. (Cf. *City of San Diego v. Southern Cal. Tel. Co.* (1949) 92 Cal.App.2d 793, 800 ["There is a natural distinction between the ordinary use of streets by the public for travel and other purposes, and the exclusive and more or less permanent use of portions of streets for [utilities to lay their equipment]."].) Counsel for Oakland suggested during oral argument that the waste haulers may have attained the special ability to drive heavy vehicles and to place waste receptables on Oakland's streets, but these statements by counsel are not evidence and do not amount to an admission or stipulation of fact. (*Adelstein v. Greenberg* (1926) 77 Cal.App. 548, 552.) Because there is a factual question as to whether the challenged fees were paid as consideration for a special "use of

local government property" within the meaning of article XIII C, the applicability of Exemption 4's first clause cannot be resolved in Oakland's favor on demurrer. As we conclude Oakland has not demonstrated that Exemption 4 applies to its challenged fees, we do not address the Court of Appeal's holding that Exemption 4 should be interpreted to include a requirement that an exempt fee be "reasonably related to the value of the franchise." (*Zolly*, *supra*, 47 Cal.App.5th at p. 88.)

Finally, we note that several amici argue that Oakland's challenged fees should be subject to article XIII C, section 1, subdivision (e)(1) (Exemption 1), which exempts a charge "imposed for a specific benefit conferred or privilege granted directly to the payor that is not provided to those not charged," but only if the charge "does not exceed the reasonable costs to the local government of conferring the benefit or granting the privilege." While counsel for plaintiffs acknowledged this possibility during oral argument, Oakland resists the application of Exemption 1. Yet the language of the ordinances enacting these franchise fee agreements states that the "franchise property interests conveyed here" include the right to "transact business, provide services, . . . and to operate a public utility." This language could potentially support amici's argument, given that the text of Exemption 1 appears to apply to such specific benefits. But we have no need to decide that question here. We also leave open related questions of how the "reasonable costs" language in Exemption 1 may apply to franchise fees, including whether the term, considered in light of the voters' intent behind Proposition 26, should be understood to extend beyond the purely administrative costs involved in granting a franchise. (See *Jacks*, *supra*, 3 Cal.5th at pp. 262, 269 [explaining how a "reasonable value" requirement "fit[s]

within" the historical approach to distinguishing between taxes and other charges, including the "broader focus on the relationship between a charge and the rationale underlying the charge"].)  We have no occasion to further elaborate these terms, as Oakland has not sought to show that Exemption 1 applies to its challenged fees.

## CONCLUSION

Because Oakland has not shown, as a matter of law, that article XIII C, section 1, subdivision (e)(4) applies to the franchise fees at issue here, the trial court erred in sustaining Oakland's demurrer.  We affirm the Court of Appeal's judgment and remand for proceedings consistent with this opinion.

**LIU, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**KRUGER, J.**
**GROBAN, J.**
**GUERRERO, J.**

ZOLLY v. CITY OF OAKLAND

S262634

Concurring Opinion by Justice Jenkins

I agree with the majority that the trial court should have overruled the City of Oakland's demurrer to the second amended complaint of plaintiffs Robert Zolly, Ray McFadden, and Stephen Clayton (plaintiffs) because Oakland has failed to show that the fees at issue here are, as a matter of law, exempt from the voter approval requirements of article XIII C of the California Constitution. (All references to articles are to the California Constitution.) Although I also largely agree with the majority's reasoning, as explained below, I believe that some of the majority's discussion is unnecessary to resolution of this case and I do not join that discussion. I therefore concur in the judgment.

I.

For purposes of its voter approval requirements, article XIII C defines a " 'tax' " as "any levy, charge, or exaction of any kind imposed by a local government." (Art. XIII C, § 1, subd. (e).) As the majority explains, Oakland argues that the fees at issue here "are not 'imposed by a local government' because they were a product of voluntary contractual negotiations and are thus 'consideration paid in exchange for those valuable franchise rights, including the right to do business with the municipality.' " (Maj. opn., *ante*, at p. 11.) I agree with the majority's rejection of this argument and its basis for doing so. (*Id.* at pp. 12–13.)

1

Oakland alternatively argues that the fees in question fall within one of the express exemptions to article XIII C's definition of a " 'tax' " and therefore are not subject to the voter approval requirements. Oakland relies *exclusively* on article XIII C, section 1, subdivision (e)(4) (Exemption 4), which applies to "[a] charge imposed for entrance to or use of local government property, or the purchase, rental, or lease of local government property." (*Ibid.*)

I agree with the majority that Oakland has failed to show that, as a matter of law, the fees fall within this exemption. Oakland contends in part that the franchise itself is a form of "local government property" within the meaning of Exemption 4, and that the fee is a charge imposed for "the purchase . . . of [that] local government property." However, as the majority explains, because "a franchise 'becomes property in the legal sense of the word' only '[w]hen granted' to a franchise-holder," and does not constitute "property belonging to the local government before the grant occurs," the franchise "is not 'local government property' under article XIII C." (Maj. opn., *ante*, at p. 16.) Oakland also argues that the fees qualify under Exemption 4 as charges "imposed for . . . use of local government property" because "the right to 'use the public street and/or other public places' was expressly identified as one part of the franchise property interests conveyed by Oakland to the private waste-haulers." However, as the majority explains, "Oakland has not demonstrated as a matter of law that the payors paid the challenged fees in exchange for a specific use of government property that they would not have enjoyed had they not paid the fee." (Maj. opn., *ante*, at p. 17.) Because Oakland has failed to show that, as a matter of law, any part of the fees come within Exemption 4, its demurrer should have been overruled.

2

II.

Regarding the first aspect of Oakland's argument for applying Exemption 4, the majority offers additional comment. Responding to Oakland's assertion that the franchise itself is a form of "local government property" that the fees are paid to "purchase," the majority first opines: "[T]he term 'local government property' in article XIII C seems to refer to physical objects under the control of a local government, such as its streets and rights-of-way." (Maj. opn., *ante*, at p. 15.)

I do not join this discussion because, in my view, it is unnecessary to resolve this case. The majority's conclusion — with which I agree — that the franchise itself does not constitute "local government property" within the meaning of Exemption 4 completely disposes of Oakland's argument that the fee is payment for the "purchase . . . of local government property." We therefore need not speculate on whether "the term 'local government property' in article XIII C seems to refer [only] to [actual] physical objects" and not to mere "property interests in such objects." (Maj. opn., *ante*, at pp. 15, 16.)

At the end of its opinion, the majority "note[s]" the argument of several amici that the fees here at issue are "subject to article XIII C, section 1, subdivision (e)(1) (Exemption 1), which exempts a charge 'imposed for a specific benefit conferred or privilege granted directly to the payor that is not provided to those not charged,' but only if the charge 'does not exceed the reasonable costs to the local government of conferring the benefit or granting the privilege.' " (Maj. opn., *ante*, at p. 20.) As the majority explains, "we have no need to decide" in this case whether "Exemption 1 applies to [the] challenged fees" because "Oakland has not sought to show" that it does. (Maj. opn., *ante*,

at pp. 20, 21.)  Nor, accordingly, need we speculate or comment on what questions might "relate[]" to Exemption 1's possible application.  (Maj. opn., *ante*, at p. 20.)  I therefore do not join the majority's statement that "the text of Exemption 1 appears to apply to . . .  specific benefits" other than the use of Oakland's property, or the majority's comments about questions that may be "related" to that issue.  (Maj. opn., *ante*, at p. 20.)

With these limitations, I concur in the judgment.

**JENKINS, J.**

**I Concur:**

**CORRIGAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Zolly v. City of Oakland

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 47 Cal.App.5th 73
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S262634
**Date Filed:** August 11, 2022

_____

**Court:** Superior
**County:** Alameda
**Judge:** Paul D. Herbert

_____

**Counsel:**

Zacks, Freedman & Patterson, Andrew M. Zacks; Katz Appellate Law and Paul J. Katz for Plaintiffs and Appellants.

Horvitz & Levy, Jason R. Litt, Jeremy B. Rosen and Joshua C. McDaniel for McLane, Bednarski & Litt LLP and Rapkin & Associates, LLP, as Amici Curiae on behalf of Plaintiffs and Appellants.

Jonathan M. Coupal, Timothy A. Bittle and Laura E. Dougherty for Howard Jarvis Taxpayers Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Peluso Law Group and Larry A. Peluso for Reuben Zadeh, Mable Chu and Herb Nadel as Amici Curiae on behalf of Plaintiffs and Appellants.

Barbara Parker, City Attorney, Doryanna Moreno, Maria Bee, David Pereda, Celso Ortiz and Zoe Savitsky, Assistant City Attorneys; Chao ADR, Cedric C. Chao; DLA Piper, Tamara Shepard, Mauricio

Gonzalez, Stanley J. Panikowski and Jeanette Barzelay for Defendant and Respondent.

Best Best & Krieger, Joshua Nelson, Lutfi Kharuf and Joanna Gin for League of California Cities and the California State Association of Counties as Amici Curiae on behalf of Defendant and Respondent.

Olson Remcho, Robin B. Johansen, Thomas A. Willis and Margaret R. Prinzing for Legislature of the State of California as Amicus Curiae on behalf of Defendant and Respondent.

Orrick, Herrington & Sutcliffe, Brian P. Goldman, Devin Brennan, Monica Haymond, Ethan P. Fallon; Kathleen A. Kane and Adrienne D. Weil for Bay Area Toll Authority and Metropolitan Transportation Commission as Amici Curiae on behalf of Defendant and Respondent.

Kabateck, Brian S. Kabateck and Mike Arias for Consumer Attorneys of California as Amicus Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Paul J. Katz
Katz Appellate Law PC
484 Lake Park Avenue, #603
Oakland, CA 94610
(510) 920-0543

Cedric C. Chao
Chao ADR, PC
50 California Street, Suite 1500
San Francisco, CA 94111
(415) 293-8088